Michael S. Weinstein, Esq.
 GOLENBOCK EISEMAN ASSOR
 BELL & PESKOE LLP
437 Madison Avenue
New York, New York 10022
(212) 907-7300

*Counsel for Jonathan L. Flaxer,*
*Former Chapter 11 Trustee and Current Plan Administrator for Lehr Construction Corp.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| LEHR CONSTRUCTION CORP., | : | Case No. 11-10723 (SHL) |
| | : | |
| Debtor. | : | |

------------------------------------------------------------X

**APPLICATION OF JONATHAN L. FLAXER**
**FOR FIRST AND FINAL ALLOWANCE OF COMPENSATION**
**AND REIMBURSEMENT OF EXPENSES AS CHAPTER 11 TRUSTEE**

**TO THE HONORABLE SEAN H. LANE,**
**UNITED STATES BANKRUPTCY JUDGE:**

  Jonathan L. Flaxer, the chapter 11 trustee (the "**Trustee**" or "**Applicant**") solely in his

capacity as chapter 11 trustee of the bankruptcy estate (the "**Estate**") of Lehr Construction Corp.

(the "**Debtor**"), hereby submits this application (the "**Application**") for an order under §§ 326

and 330 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 2016 of the

Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rule 2016-1 of the Local

Bankruptcy Rules of the United States Bankruptcy Court for the Southern District of New York

(the "**Local Bankruptcy Rules**"), and the Guidelines of the Office of the United States Trustee

for Reviewing Applications for Compensation and Reimbursement of Expenses filed under 11

U.S.C. § 330, adopted on January 30, 1996 (the "**Guidelines**") for a final allowance of

compensation and reimbursement of disbursements of the Trustee from May 16, 2011 through

the Effective Date (defined below) (the "**Period**").  In support thereof, I respectfully represent as follows:

<u>Jurisdiction and Venue</u>

1.      This Court has subject matter jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue of this proceeding and this Application is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

<u>Preliminary Statement</u>

3.      In accordance with the Guidelines and Bankruptcy Rule 2016(a), annexed hereto as **Exhibit K** is the Certification of Jonathan L. Flaxer dated November 13, 2015 (the "**Certification**"), the Certifying Professional within the meaning of the Guidelines on behalf of Applicant.  The Trustee states that all services for which compensation is sought herein were rendered solely in connection with the Estate and not on behalf of any individual creditors and/or other persons, and the Certification confirms the foregoing.

**A.      Background**

4.      On February 21, 2011 (the "**Petition Date**"), the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York t(the "**Court**").  Until May 16, 2011, the Debtor had been operating as a debtor-in-possession.

5.      The Debtor was formed in 1979 by Gerald Lazar ("Lazar") and Frederick Coffey ("Coffey").  The Debtor specialized in interior construction and served clients mainly throughout the New York metropolitan area.  The Debtor served as both a construction manager and/or general contractor for its clients.

2403861.1

6.      The Debtor's projects ranged from minor renovations to interior office build-outs of over a million square feet.  The Debtor's broad range of clients included retail stores, financial service firms, educational organizations, entertainment and media firms, and many others.

7.      In or about 1995, the Office of the Manhattan District Attorney (the "Manhattan DA") commenced an investigation of the Debtor (the "First Investigation").   As a result of the First Investigation, the Debtor paid a large fine, but the company survived.

8.      In or about early 2010, the Manhattan DA commenced another investigation into the New York City construction industry (the "Second Investigation").

9.      On March 9, 2010, the Criminal Court of the State of New York, County of New York, issued a search warrant to the New York State Police to search the Debtor's premises at 902 Broadway, New York, New York in connection with the Second Investigation.

10.     On March 10, 2010, the New York State Police executed the search warrant at the Debtor's premises and seized numerous paper and electronic records related to the Second Investigation (the "Raid").

11.     The fact that the Debtor was a target of the Second Investigation was well-publicized.   Several news outlets, including The New York Times, published stories identifying the Debtor as a target, printed photographs of the Raid in progress, and described the Debtor's prior involvement in the First Investigation as well as the guilty pleas of the Debtor's principals at the time.  The Debtor was the only target of the Second Investigation mentioned by name.

12.     Upon information and belief, at the time of the Raid, the Debtor was already struggling to bring in new business.   The Second Investigation and its publicity created an additional threat to the financial survival of the Debtor.  As a result of becoming aware of the Second Investigation, several customers removed the Debtor as a candidate from their bidding

process, and other customers cancelled existing contracts with the Debtor. In addition, certain customers or potential customers expressed to employees of the Debtor their concern that the Debtor might not finish new construction projects. This concern had a severely negative impact on the Debtor's business and prospects.

13. The Debtor did not adapt to its changing environment, and on February 21, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Until May 16, 2011, the Debtor was authorized to operate its business and manage its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

14. By Order dated March 24, 2011, Cooley LLP ("Cooley") was retained by the Debtor as its bankruptcy counsel.

15. On March 11, 2011, the Office of the United States Trustee (the "U.S. Trustee") formed an Official Committee of Unsecured Creditors (the "Creditors Committee").

16. By Orders dated April 11, 2014, the Creditors Committee retained Klestadt & Winters, LLP ("Klestadt") as its counsel, and J.H. Cohn LLP ("JH Cohn") as its financial advisor.

17. Based on the Second Investigation, on May 5, 2011, a grand jury issued an indictment of the Debtor and certain of the Debtor's employees (the "Indictment"). In the Indictment and subsequent criminal proceeding, the Manhattan DA alleged, in summary, that the Debtor stole money from its customers by coordinating with its subcontractors to inflate construction costs on "cost-plus" jobs – where the customer paid all construction costs and the Debtor's profit was a set fee – and such subcontractors covertly transferred these monies to the Debtor by reducing their construction costs on "firm price" jobs – where the Debtor's profit was

the difference between the price agreed upon with the customer and the actual construction costs. Thus the Debtor ultimately received the monies paid by cost-plus customers to subcontractors that the Debtor should have returned to such customers (collectively, the "Criminal Scheme").

18.     On or about May 5, 2011, shortly after issuance of the Indictment, the U.S. Trustee filed a motion for the appointment of a chapter 11 trustee, and on May 11, 2011, the Court granted that motion directing appointment of a chapter 11 trustee.

19.     On May 16, 2011, the U.S. Trustee filed a motion for approval of the appointment of Jonathan L. Flaxer as the chapter 11 trustee. The Court approved the U.S. Trustee's motion by order of the same date.

**B.      Services Rendered**

   **I.      Initial Investigation and Wind Down of Operations**

20.     The following is a summary of the professional services I have rendered during the Fee Period. I have not attempted to describe each and every item of service rendered, but rather provide a general description that highlights important services rendered during the Fee Period.

21.     My initial tasks were to quickly understand and gain control of the Debtor's ongoing business affairs and cash. I also needed to assemble a team of professionals. I immediately arranged with the Debtor's financial and accounting personnel to take over all existing bank accounts and became the sole signatory on those accounts, as Trustee of the Debtor. I also retained Golenbock Eiseman Assor Bell & Peskoe LLP ("**GEABP**") as my counsel, and, after several interviews, determined to engage Marotta, Gund, Budd & Dzera, LLC ("**MGBD**") as my financial advisors. I later engaged Davis, Graber, Plotzker & Ward, LLP ("**DGPW**") as my tax accountants, Wolf Haldenstein Adler Freeman & Herz LLP ("**WHAFH**")

to serve as my special conflicts counsel, Glanstein LLP ("**Glanstein**") as special labor and employee benefits counsel and the Law Offices of Moshie Solomon as special New Jersey counsel.

22.     I also immediately called two simultaneous meetings at the Debtor's premises: first, for me and MGBD to meet with the Debtor's executives to understand and gain control of the daily operations, and second, for GEABP to meet with the Debtor's counsel so that my counsel could get up to speed on all pending legal issues and arrange for a transition of all pending legal matters.  I learned at that meeting that the Debtor was facing an immediate cash crisis.  It lacked sufficient funds to meet the payroll that was due in a few days plus already-written checks that were about to hit the mail.[1]  In addition, the Debtor's budgeting and forecasting systems were woefully insufficient and, as a result, it was not possible to determine expected receipts or disbursements.  Based on MGBD's advice, I placed a moratorium on disbursements in order to be able to meet payroll, and directed MGBD to prepare a thirteen week forecast.  I also learned that deficiencies in the Debtor's accounting systems rendered it impossible to determine whether its approximately 30 ongoing jobs were profitable or unprofitable.  In order to make a decision as to whether to immediately shut down all ongoing operations, or attempt to complete all, or certain of, the open jobs, I directed MGBD to prepare an analysis of each job in order to determine whether they were profitable or unprofitable.[2]  Based upon these analyses, I determined to continue to operate the Debtor in order to complete

---

[1] Not only was the Debtor in a negative cash position, but it had expended the proceeds of the $1 Million DIP loan and faced accrued administrative expenses of another approximately $1 million.

[2] This involved, in essence, an analysis of whether unpaid claims of subcontractors (a substantial portion of which were a result of the Debtor's failure to abide by Article 3A of the New York Lien Law) exceeded anticipated revenue from the customer on the job.

the profitable jobs.  I ceased work on the unprofitable jobs and directed GEABP to seek orders rejecting the contracts relating to those jobs.

23.     As a result of the payment moratorium (other than payroll), payment of certain union dues was temporarily deferred.  This led to a number of union workers appearing at Lehr's offices threatening to shut down the jobs unless union dues were paid.  With MGBD's assistance, I was able to negotiate payment of ongoing union dues on a weekly basis together with a schedule for curing certain defaulted union dues, and the crisis was averted.

24.     I, together with MGBD, also met with counsel to and certain members of the Creditors' Committee[3] in order to gain their insight into the case, the ongoing jobs, and the prospects for a distribution.

25.     In these early weeks of my trusteeship, I devoted substantial effort to gain confidence and trust among Lehr's management as well as in the subcontractor community.  I spent a majority of my time at Lehr's premises during the approximately first six months of the case in order to accomplish these goals and supervise the ongoing jobs as well as the wind down of Lehr's business.  Part of this effort included developing a program of staff reductions in a manner that did not impair my ability to complete the ongoing jobs.  I also determined to honor the Debtor's existing severance program except with respect to senior executives.

26.     I also devoted a substantial amount of time to an initial round of abandonment of records in order to defray storage costs, and to moving to smaller space to reduce rental costs.  I first consolidated operations onto one of the two floors at 902 Broadway, and, several months later, negotiated a move to a much smaller temporary space (approximately six offices) at 245 Park Avenue, managed by Regus.  Ultimately, I further downsized by moving the Debtor to the

---

[3] All members of the Creditors' Committee were subcontractors of the Debtor.

offices of GEABP, which freed up a conference room and administrative space for the approximately five remaining employees.[4]

27.     In the effort to complete profitable jobs, I encountered substantial mistrust and suspicion among Lehr's customers, which frequently resulted in deferred payment. These payment delays resulted in a series of cash crunches which required very careful cash management in order to continue the orderly wind down. MGBD's assistance in this respect was invaluable.

28.     Although the initial projection had been that ongoing profitable jobs could be completed by the end of August, one large job in particular would clearly stretch out well beyond September. This created a crisis with respect to the Debtor's expiring liability insurance, absent which all work would have to be immediately terminated. In light of Travelers' refusal to extend the liability insurance, I negotiated a transfer of the ongoing jobs to an entity controlled by one of Lehr's principals that did have liability insurance, and made a motion to approve that arrangement. The making of that motion caused renewed discussions with Travelers, and ultimately the motion was withdrawn in favor of an extension of insurance from Travelers at a manageable cost.

29.     Applicant also devoted substantial time to the resolution of a series of disputes with Hofstra regarding its allegations of defects and other supposed problems with respect to the ongoing construction. Through a series of interim agreements providing for progress payments, I was ultimately able to complete the job and obtain payment therefor.

30.     Ultimately the profitable jobs were completed which, among other things resulted in payments to subcontractors of in excess of $12 million, and the avoidance of what would have

---

[4] GEABP did not charge the Estate for the use of this space, which saved a substantial amount of money for the Estate.

been enormous claims against the Estate from not only unpaid subcontractors, but also from customers resulting from failure to complete the jobs and the attendant cost of delay, and transition of the jobs to substitute general contractors -- at higher prices than the Debtor's existing contract price.

## II. Criminal Proceedings

31. In order to comprehensively investigate the Debtor's affairs as well as to assist in determining what claims may exist against former employees, officers, directors and third parties, it was necessary to review and understand the Criminal Scheme (amply described in prior pleadings) and the criminal proceedings. In this respect, I, with the assistance of GEABP, reviewed transcripts of the grand jury proceedings and met with representatives from the Manhattan DA. In this respect, Applicant, in conjunction with GEABP, sought to avoid the expense of having counsel attend the entire trial. Ultimately, I was able to be excused from participation in the trial upon a condition that I accept the record made at the trial but preserve my right to argue against conviction of Lehr. With the assistance of GEABP I also negotiated a limited waiver of the attorney client privilege in order to permit a certain evidence to be presented by one of the defendants at the trial. In addition, I negotiated an agreement with the Manhattan DA under which I would disburse the restitution fund created by the Manhattan DA, and obtain approval of that agreement pursuant to the plan of reorganization.

## III. Litigation

32. During the wind down phase I, with the assistance of MGBD and GEABP, began the process of investigating the affairs and conduct of Debtor in order to determine whether causes of action existed that would inure to the benefit of the Estate. This included an investigation of the pre- and post-petition conduct of professional firms that have been engaged

by the Debtor. I led and directed this investigation, and made all decisions regarding the assertion of claims, the settlement strategy regarding potential claims, the commencement and settlement of litigation and the strategy regarding litigation, and, in one instance, arbitration. I also supervised the process of obtaining court approval pursuant to Bankruptcy Rule 9019(a) of the various settlements I reached. In most instances, I personally negotiated the settlements in order to minimize legal time and expense. Below is a summary of the results of the litigation effort.

| Defendant(s) | Type of Action | Adv. Pro. Number | Benefit to Estate |
|---|---|---|---|
| Gerald Lazar<br>Janet Lazar<br>David Lazar<br>Deborah Galant | Claims against Former Management | None | $2,000,000 plus waiver of DIP loan ($1.3 million) and other unsecured claims |
| Frederick Coffey<br>Margaret Coffey | Claims against Former Management | None | $470,000.00 |
| Todd Phillips<br>Stacy Bradie<br>Lankler Siffert & Wohl LLP | Claims against Former Management | None | $315,000.00 |
| Steven Halper<br>David S. Hammer | Claims against Former Management | None | $185,000.00 |
| Cooley LLP | Claims Against Professionals | None | Waiver of $700,000 administrative claim and repayment of $35,000 retainer |
| Rosen Seymour Shapss Martin & Company LLP | Claims Against Professionals | 13-01525 | $1,250,000.00 |
| Winston & Strawn LLP | Construction-related breach of contract | 11-02252 | $100,000.00 |
| ION Media Network, Inc. | Construction-related breach of contract | 11-02391 | $42,500.00 |
| Bloomingdale Properties, Inc. | Construction-related breach of contract | 11-02803 | $15,000.00 |
| Metropolitan/NJS Architectural Woodwork | Construction-related breach of contract | 11-02804 | Consent to Entry of Judgment |
| Andres Mejia | Construction-related breach of contract | 12-01041 | $11,350.00 |
| Katten Muchin Rosenman LLP | Construction-related | 12-01042 | $13,870.00 |

| | breach of contract | | |
|---|---|---|---|
| 1400 Broadway | Construction-related breach of contract | 12-01049 | $155,989.00 |
| Fast Track Construction Al Hot | Construction-related breach of contract | 12-01052 | $28,000.00 |
| Renaissance Technologies LLC | Construction-related breach of contract | 12-01100 | $190,000.00 |
| WAFRA Investment Advisory Group | Construction-related breach of contract | 12-01213 | $8,307.00 |
| Li-Fung USA Li & Fung USA | Construction-related breach of contract | 12-01726 | $20,126.00 |
| Pride Enterprises New York, Inc. Green Flooring Systems LLC | Resolution of Trust Funds | 12-01719 12-04508 | $26,278.00 |
| C.J. Mason Inc., et al. | Resolution of Trust Funds | 13-01316 | $61,148.91 |
| International Blind Contractors, Ltd. | Other Breach of Contract | 13-01270 | $12,500.00 |
| Control Risks LLC | Other Breach of Contract | 13-01256 | $13,900.00 |
| Steven Wasserman | Faithless Servant | 13-01258 | $45,000.000 |
| Paul Tramontano | Faithless Servant | 13-01259 | $175,000.00 |
| Paul McQuillan | Faithless Servant | 13-01261 | $3,000.00 |
| Dwayne Mitchell | Faithless Servant | None | $7,500.00 |
| Jeffrey Lazar | Faithless Servant Avoidance Action | None | $227,500.00 |
| Mark Martino Clayman & Rosenberg LLP | Faithless Servant Avoidance Action | None | $50,000.00 |
| Spears & Imes LLP | Avoidance Action | 13-01258 13-01339 | $100,000.00 |
| Sandor Frankel P.C., Frankel & Abrams, Sandor Frankel, the Estate of Stuart Abrams | Avoidance Action | 13-01261 | $12,000.00 |
| Microsoft Licensing, GP | Avoidance Action | 13-01263 | Release of claims in the amount of $76,797.98 |
| Cellco Partnership d/b/a Verizon Wireless | Avoidance Action | 13-01264 | Release of claims in the amount of $44,049.90 |

2403861.1

| | | | |
|---|---|---|---|
| GE Information Technology Solutions, Inc. d/b/a IKON Financial Services, f/k/a IOS Capital, LLC | Avoidance Action | 13-01265 | $3,000.00 |
| Softchoice Corporation | Avoidance Action | 13-01266 | $10,000.00 |
| PSM Corp. | Avoidance Action | 13-01267 | $2,500.00 |
| Travel Yesterday, Inc., d/b/a Fischer Travel Enterprises Direct Airway, Inc. | Avoidance Action | 13-01268 | $275,000.00 |
| Mercedes-Benz Financial Services USA LLC f/k/a DCFS USA LLC, servicer for Daimler Trust | Avoidance Action | 13-01269 | $6,000.00 |
| Trustees of the General Building Laborers' Local 66 Welfare Fund, et al. | Avoidance Action | 13-01273 | $7,000.00 |
| First Unum Life Insurance Company | Avoidance Action | 13-01662 | $100,000.00 |
| Marquis Jet Partners, Inc. | Avoidance Action | 13-01764 | $250,000.00 |
| Trustees of the Mason Tenders District Council Welfare Fund, et al. | Avoidance Action | 13-01272 | Reduction of administrative claim by the amount of $71,644.36 |
| Kelley Drye LLP | Avoidance Action | None | $28,000.00 |
| Hughes Hubbard & Reed LLP | Avoidance Action | None | $45,000.00 |
| Meritain Health | Avoidance Action | None | $6,000.00 |
| Qwest Communications Company, LLC d/b/a CenturyLink QCC | Avoidance Action | None | $8,400.00 |
| T2 Litigation | Avoidance Action Breach of Duty | 06-20572 (Bankr. D.N.J.) | $135,000.00 |

33.     The results described above have the effect of turning a deeply administratively

insolvent estate into a solvent estate that is now in a position to make a distribution -- albeit

modest -- to general unsecured creditors.

**IV. Insurance/Employee Benefit Plans**

34.     My services relating to insurance break down into three basic categories: (i) errors & omissions and crime policies; (ii) personal injury/workers' compensation polices; and (iii) employee benefit plans. I engaged the Glanstein firm to assist me with the employee benefit plans, and familiarize myself with the Debtor's various pension, severance, health and other employee benefits. This involves extensive communications with the health insurer, including obtaining extensions of the plan, negotiating premiums, and ultimately shutting down the plan in accordance with applicable law (and with the assistance of Glanstein), giving appropriate notices, and transferring the plan to a substitute insurer. I performed similar services with respect to shutting down and transitioning the 401k plan. As mentioned above, I honored the Debtor's severance plan except with respect to senior executives, and worked closely with the Debtor's assistant controller in calculating the appropriate severance amounts due upon termination of employees. I also had numerous group and individual meetings with employees to explain what I was doing, and the impact on them.

35.     With the assistance of GEABP, I analyzed potential claims under the Debtor's E&O, and crime policies, and ultimately negotiated a settlement in the amount of $630,000 with Catlin Specialty Insurance Company, the E&O insurer. In consultation with GEABP, I ultimately concluded that I did not possess a viable claim under the crime policy. I also expended substantial time reviewing and understanding the somewhat complicated personal injury/workers comp policy and program agreements with Travelers. It became clear that settlement of the approximately thirty outstanding personal injury, workers comp and property damage cases would assist in reaching an agreement with Travelers regarding the return of the approximately $4.3 million of cash collateral held by Travelers to secure the Debtor's

$200,000 self-insured retention per casualty event.  In this respect, I directed GEABP to file necessary papers to set up a mediation protocol, and this Court was kind enough to arrange for the Honorable Cecelia G. Morris, Chief Judge of this Court, to serve as mediator.  I have personally handled the mediations, and at this point, have reduced the number of outstanding claims from approximately 30 to approximately 7.  I am also in negotiations with Travelers regarding return of a portion of the cash collateral, but should those negotiations fail I will instruct GEABP to make an appropriate motion to, among other things, estimate an appropriate number for Travelers' remaining liability (if any) in order to obtain the return of as much as the $4.3 million held by Travelers as possible.

## V.      Claim Objections

36.      When it became clear that a distribution to general unsecured creditors had become a possibility, I worked closely with MGBD and GEABP to develop a program for adjusting claims.  I have reviewed each of the 14 omnibus objections to claims, as well as participated in negotiations to settle as many of those claims as possible in order to avoid litigation.  As a result of those efforts non-professional administrative claims have been reduced from $5,783,979.40 to $471,334.55, non-administrative priority claims have been reduced from $385,321.78 to $50,246.00 and general unsecured claims have been reduced from $181,853,517.77 to $5,478,036.36.[5]

## VI.      Plan and Disclosure Statement

37.      Contemporaneously with commencing the claims objection process, I, in conjunction with GEABP, formulated the elements of a plan of reorganization.  This involved in

---

[5] The reduced amount of administrative claims includes an $85,000 claim that is the subject of a pending, but unresolved, claims objection.   The reduced amount of general unsecured claims includes (i) approximately $300,000 in customer claims, which will only receive distributions after all other general unsecured claimants receive catch-up payments equal to what the customer claimants receive from the restitution fund, and (ii) approximately $935,000 in claims, which are subject to a pending, but unresolved, claims objections.

developing some novel provisions, including meshing the Manhattan DA settlement with the priority scheme of the Bankruptcy Code, resulting in the creation of two categories of customer claims, the subordination of subcontractor claimants who participated in the Criminal Scheme and the development of a protocol providing for the distribution of trust funds to subcontractors entitled thereto on a pro rata, per job basis. I reviewed the initial drafts of the disclosure statement and plan carefully, and made extensive comments thereto. Ultimately the disclosure statement and the plan were confirmed.

## VII.    Miscellaneous Matters

38.    As Trustee, I have managed the bookkeeping and financial elements of the administration of the case since my appointment. In this respect I worked closely with MGBD to make sure that all deposits and disbursements were properly labeled and recorded. This facilitated the generation of MOR's, which I endeavored to file on a consistent and timely basis.

39.    I have engaged in extensive communications with all parties in interest, including employees, officers, creditors, subcontractors, government agencies and officials, and the various attorneys and representatives thereof. In this respect, I endeavored at all times to create an atmosphere of transparency and availability, so that all parties in interest felt that their various issues and concerns were being properly heeded and that the Estate was being administered in a responsible and professional manner. I respectfully submit that this approach facilitated the results achieved in the administration of the Estate.

## COMPENSATION AND REIMBURSEMENT REQUESTED

40.    By this Application I respectfully seek entry of an order pursuant to sections 326 and 330 of the Bankruptcy Code authorizing an award of $900,000 [6] on a final basis as

---

[6] The total amount of disbursements for the entire case is approximately $28,671,583.02. The figure does not include the sum of $2,400,000 that I will distribute on or shortly after the Effective Date.

2403861.1

compensation for services rendered to the Estates by me and my staff during the Period, representing approximately 3.0%[7] of the amounts disbursed, and which are anticipated to be disbursed by me.

41.    During the Period I have expended 3,175 hours[8] in this case, which, at ordinary and customary billing rates, calculates to total billings of $2,038,580.50 using the lodestar method. [9]

## BASIS FOR RELIEF

42.    A trustee's compensation is derived from section 326(a) of the Bankruptcy Code., which provides, in pertinent part,

> the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed 25 percent on the first $5,000 or less, 10 percent on any amount in excess of $5,000 but not in excess of $50,000, 5 percent on any amount in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3 percent of such moneys in excess of $1,000,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims.

Section 330(a)(7) of the Bankruptcy Code refers specifically to Section 326:

> In determining the amount of reasonable compensation to be awarded to a trustee, the court shall treat such compensation as a commission, based on section 326.

---

[7] The maximum commission authorized under section 326(a) of the Bankruptcy Code would result in a final award of approximately $955,400.  By seeking $900,000, I am seeking slightly less than the maximum authorized commission.

[8] Attached to this Application as **Exhibit A** through **I** are my daily time records for the Period, broken down into the following categories:  general/wind-down, retentions, fee matters, plan and disclosure statement, criminal, litigation, creditors committee, insurance and claims objection.

[9] Attached as **Exhibit J** is the detail for out-of-pocket expenses for the Period produced from the computer records maintained in the ordinary course of business that were used to compile such information.

2403861.1

43.     With respect to the evaluation of compensation in light of the foregoing, section

330 of the Bankruptcy Code  provides the following:

> (a)(1) After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326 . . . the court may award to a trustee . . .
>
>> (A)     reasonable compensation for actual, necessary services rendered by the trustee . . . and by any paraprofessional person employed by [the trustee]; and
>>
>> (B)     reimbursement for actual, necessary expenses.
>
> . . .
>
> (a)(3) In determining the amount of reasonable compensation to be awarded ..., the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—
>
>> (A)     the time spent on such services;
>>
>> (B)     the rates charged for such services;
>>
>> (C)     whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>>
>> (D)     whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
>>
>> (E)     with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
>>
>> (F)     whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

44.     Section 330 requires the court to consider the nature, the extent and the value of the services rendered by the professional. *In re Drexel Burnham Lambert Group, Inc.*, 133 B.R. 13, 24 (Bankr. S.D.N.Y. 1991). Section 330 requires the court to consider "the results obtained, time expended by the trustee, return to the estate, intricacies of the problems involved, and opposition involved." 3 COLLIER ON BANKRUPTCY ~ 330.03[1] (15th ed. rev. 2005). *See also In re Frost*, 214 B.R. 295, 297 (Bankr. S.D.N.Y. 1997).

45.     When read together, §§ 330(a)(1) and 326(a) authorize reasonable compensation for trustee services, whether such services are performed by the trustee or his/her staff, subject to the limits of § 326. *In re Stewart*, 151 B.R. 255, 259-60 (Bankr. C.D. Cal. 1993).

46.     Section 330 of the Bankruptcy Code authorizes a bankruptcy court to award a trustee reasonable compensation for actual, necessary services rendered by the trustee . . . and by any paraprofessional persons employed by any such person. 11 U.S.C. § 330(a)(1). Section 330(a)(7) provides that compensation awarded to a trustee under section 330 shall be treated as a commission pursuant to section 326.

47.     The criteria for measuring "reasonable compensation" begins with the factors set out under section 330(a)(3) of the Bankruptcy Code. To determine the amount of "reasonable compensation", the Court must consider the nature, the extent and the value of the services rendered by the professional, taking into account all relevant factors, which include: (a) the time spent on such services; (b) the rates charged for such services; (c) whether the services were necessary and beneficial towards the completion of the bankruptcy case; (d) whether the services were performed in a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and (e) whether the compensation is

reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under the Bankruptcy Code. *See* 11 U.S.C. § 330(a)(3).

48.     As the Second Circuit has held, "the first step in the calculation of reasonable attorney's fees is the determination of the so-called 'lodestar' amount. The lodestar amount represents the number of hours reasonably worked on a case multiplied by the reasonable hourly rate." *Wells v. Bowen*, 855 F.2d 37, 43 (2d Cir. 1988) (citations omitted); s*ee also, In re Masterwear Corp.*, 233 B.R. 266, 277 (S.D.N.Y. 1999); *In re Cena's Fine Furniture, Inc.,* 109 B.R. 575, 580 (E.D.N.Y. 1990) (the 'lodestar' method of fee calculation ... is *the* method to be used to determine a 'reasonable' professional fee in all the federal courts, including the bankruptcy courts) (emphasis in original); *In re Cuisine Magazine, Inc.*, 61 B.R. 210, 212-13 (Bankr. S.D.N.Y. 1986).

49.     Although the lodestar approach originally was applied to attorney's fees, bankruptcy courts have utilized elements of the lodestar approach to compensation of chapter 7 and 11 bankruptcy trustees subject to sections 326 and 330 of the Bankruptcy Code. *See In re Brous,* 370 B.R. 563 (Bankr. S.D.N.Y. 2007); *In re Jones*, 374 B.R. 506 (Bankr. E.D.N.Y. 2007); In *re Guyana Development Corp.*, 201 B.R. 462 (Bankr. S.D. Tex. 1996).

50.     The "lodestar" approach incorporates most of the *Johnson* factors through its application. *Masterwear*, 233 B.R. at 277; *Pennsylvania v. Delaware Valley Citizens' Council*, 478 U.S. 546, 566 (1986) ("the 'novelty and complexity of the issues,' 'the special skill and experience of counsel,' the 'quality of representation,' and the 'results obtained' from the

representation are presumably fully reflected in the lodestar amount") (citing *Blum v. Stenson*, 465 U.S. 886, 898-900 (1984)).[10]

51.     The role of a trustee is unique in a bankruptcy case.  In evaluating a trustee's fee request such as in these cases, a court is not evaluating the skill required of the attorney, but of a trustee, the fiduciary in the case.  *Connolly v. Harris Trust Co. (In re Miniscribe Corp.)*, 257 B.R 56 (Bankr. D. Colo. 2000); *see generally In re Abraham*, 163 B.R. 772 (Bankr. W.D. Tex. 1994). For example, a trustee must "bring the skill of a chief executive officer" and be able to be a "consummate negotiator, one who can converse with conviction and credibility with opposing sides," as well as handle a role that carries with it the burden of making the final decisions. *Connolly v. Harris Trust Co. (In re MiniScribe Corp.)*, 241 B.R. 729, 750 (Bankr. D. Colo. 1999).  "The buck stops at the trustee's desk, not at the desk of legal counsel."  *In re MiniScribe Corp.,* 257 B.R. at 63.  Accordingly, in evaluation of the fee request, a trustee is entitled to some recognition for the nature of the position and the services provided in the role of trustee. *Id.*

52.     I seek a proposed final award of $900,000.  During the Period, I expended 3,175 hours, which, at my hourly rate in effect at the time, results in a lodestar of $2,047,168.42.  The blended hourly rate is $652.50.  I submit that this case posed several unique and difficult challenges due, among other things, to the criminal conduct and criminal proceedings, lack of reliable books and records, lack of analysis of whether the jobs were profitable or unprofitable, severe obstacles to completion of jobs, recurring cash crises, personnel and human resources issues and novel issues in the plan process.

---

[10]  The entirety of the *Johnson* factors include: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorneys due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.  *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 720 (5th Cir. 1974).

53.     The commission I seek is slightly less than the statutory maximum, but is less than half of my lodestar amount.  This results in part from my determination to separate trustee services from legal services, and to not bill any of my time to legal services.  For much of the first year of this case, I spent a substantial part of my time at the Debtor's premises, managing a difficult and challenging wind down.  When I was appointed, the Estate was administrative insolvent in an amount likely in excess of $2 million.  In light of the results achieved, including overcoming substantial insolvency and being able to make a distribution to general unsecured creditors, I submit that the requested commission is reasonable.[11]

54.     The services summarized by this Application, and rendered by me during the Chapter 11 Fee Period were substantial, professional, and beneficial to the administration of the estates.  They were reasonable and necessary to the preservation and maximization of the estates for the benefit of their creditors.

55.     Based on the foregoing, I submit that considering (a) the time and labor required of me; (b) the skill required of me to perform the services involved; (c) my customary fees for such work; (d) my experience, reputation and ability; (e) the unique complexities of the case; (f) the risks of non-payment and "undesirability" of the case; and (f) most importantly, the results obtained for the creditors, the Trustee compensation sought in this Application is fair and reasonable.

### The Trustee's Expenses Are Reimbursable

56.     Section 330 of the Bankruptcy Code authorizes reimbursement for actual and necessary expenses.  11 U.S.C. § 330(a)(1)(B).  Expenses are considered "actual" if they are in

---

[11] Under the Manhattan DA Agreement, I am, upon court approval, entitled to up to 3% of the Restitution Fund (approximately $30,000) as compensation for administering it.  I intend to apply this to the amount of Section 326(a) commissions awarded by this Court -- thereby further reducing the amount.  In addition, except for the approximately $30,000 from the Restitution Fund, I intend to defer payment of the commission in order to make a 5% distribution to general unsecured creditors on or shortly after the Effective Date.

fact incurred, *In re S.T.N. Enter., Inc.*, 70 B.R. 823, 834 (Bankr. D. Vt. 1987), and are considered necessary where they were "reasonably needed to accomplish proper representation of the client." *In re Pac. Express, Inc.*, 56 B.R. 859, 865 (Bankr. E.D. Cal. 1985); *see also In re Korea Chosun Daily Times, Inc.*, 337 B.R. 758, 769 (Bankr. E.D.N.Y. 2005); *In re Am. Preferred Prescription, Inc.,* 218 B.R. 680, 686-87 (Bankr. E.D.N.Y. 1998) (an expense is necessary if incurred to accomplish proper representation).

57.     As with requests for compensation, the Court should consider whether the expenses were necessary to the administration of the estate, beneficial to the estate at the time they were incurred, and reasonably likely to benefit the estate. *See* 11 U.S.C. § 330(a)(3)-(4).  In making that determination, the Court should apply an objective standard.  In short, an award of expenses is determined according to substantially the same criteria and standard of reasonableness that apply to an award of attorney's fees. *Korea Chosun Daily Times*, 337 B.R. at 769-70 (citing *In re Specialty Plywood, Inc.*, 160 B.R. 627, 632 (9th Cir. B.A.P. 1993)).

58.     To be reimbursable, expenses must be attributable to a particular client and matter and are not to include overhead expenses. *In re Island Helicopter Corp.*, 53 B.R. 71, 72-73 (Bankr. E.D.N.Y. 1985) (citing *In re Thacker*, 48 B.R. 161, 164 (Bankr. N.D. Ill. 1985)). Moreover, the Guidelines identify several factors as indicative of the reasonableness of expenses, including whether the expense is economical rather than extravagant;  whether it is customarily charged to the applicant's non-bankruptcy clients;  whether the applicant has provided a detailed itemization;  whether the applicant has pro-rated expenses between the estate and other cases where appropriate;  and whether expenses are limited to the actual cost incurred. *UST Guidelines* at (b)(5).

59.     The actual and necessary expenses incurred by me in connection with these cases are reasonable in light of the services rendered as described herein.

## NOTICE

60.     I have provided notice of the Application to all creditors or their counsel and all parties who have filed a notice of appearance in these cases.  I also served a copy of the Application on the UST together with a complete set of exhibits.

61.     No previous application for the relief requested herein has been made to this or any court.

## CONCLUSION

**WHEREFORE,** I respectfully request that this Court enter an order (i) allowing final compensation in the amount of $900,000 for the Period; (ii) allowing reimbursement of disbursements in the amount of $9,763.14; (iii) permitting the final payment of $900,000; and (iv) granting such other relief as is just.

Dated: New York, New York
      November 13, 2015

                /s/ Jonathan L. Flaxer
                JONATHAN L. FLAXER, as
                Chapter 11 Trustee for Lehr Construction Corp.

2403861.1